UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**DANA SERAFIN, BAILEY SERAFIN**, and
**LIXEY FISH COMPANY,**

     Plaintiffs,

-v-

**THOMAS GONIEA**, in his individual and
official capacity, **JAMES DEXTER**, in his
individual and official capacity, **SETH
HERBST** in his individual and official
capacity, and **THE MICHIGAN
DEPARTMENT OF NATURAL
RESOURCES,**

     Defendants.

Case No.

Hon.

Mag.

**VERIFIED COMPLAINT
FOR DAMAGES, JUST
COMPENSATION, DECLARATORY, &
INJUNCTIVE RELIEF**

---

**BUTZEL LONG, P.C.**
Garett Koger (P82115)
Aaron L. Davis (P77406)
Louis F. Ronayne III (P81877)
2410 Woodlake Drive, Suite 420
Okemos, MI 48864
(248) 258-2907
koger@butzel.com
davisa@butzel.com
ronayne@butzel.com
*Attorneys for Plaintiffs*

---

## INTRODUCTION

This case is about three individual Defendants, who are officers of Defendant

Michigan Department of Natural Resources ("DNR"), carrying out Defendants' bidding to

rid Saginaw Bay of Michigan's statutorily authorized commercial fishing industry in favor

of sport fishermen. That is, Defendants chose to violate Plaintiff Dana Serafin's and Bailey Serafin's constitutional rights using an antiquated statutory provision that, until now, seems to have been kept well hidden from judicial scrutiny. Defendants' actions resulted in Dana's and Bailey's property rights being arbitrarily stripped. Defendants took these retaliatory actions because, at base, Dana and Bailey refused to capitulate to Defendants' demands. The residual effects of Defendants' unconstitutional actions have created a looming supply chain crisis on an international scale.

Indeed, Dana and Bailey supply much of Northern Michigan and Canada, among other areas, with whitefish caught from within Michigan's jurisdictional boundaries on the Great Lakes. Defendants have unconstitutionally taken one of Dana's and Bailey's most productive commercial fishing licenses, which will greatly diminish the amount of whitefish available to various businesses both here in Michigan and in Canada. As explained below and in the accompanying briefing and exhibits, it is incumbent on this Court to reign in Defendants' constitutionally offensive behavior, as purportedly sanctioned by an antiquated statutory provision; and for this Court to reestablish the whitefish supply chain at issue by ordering Dana's and Bailey's license to be returned immediately.

IBUTZEL\000161882\0001\100261302.v3-4/21/23

## PARTIES, JURISDICTION, & VENUE

1.      Plaintiff Dana Serafin is an individual, and the principal of Plaintiff Lixey Fish Company ("LFC").

2.      Plaintiff Bailey Serafin is an individual, an employee of LFC, and a co-licensee on all commercial fishing licenses at issue in this case.

3.      Plaintiff LFC is a Michigan corporation engaged in commercial fishing operations since 1999 throughout Michigan's Great Lakes, its bays, and the connecting waters between those lakes within the jurisdiction of Michigan.

4.      Defendant Thomas Goniea is a "person" within the meaning of 42 U.S.C. § 1983 and a "Commercial Fish Program Specialist" employed by the DNR's Fisheries Division, who, at all relevant times, acted under color of state law.

5.      Defendant James Dexter is a "person" under 42 U.S.C. § 1983 and is the "Fisheries Chief" of the DNR who, at all relevant times, acted under color of state law.

6.      Defendant Seth Herbst is a "person" under 42 U.S.C. § 1983 and is the "Aquatic Species & Regulatory Affairs Unit Manager" of the DNR who, at all relevant times, acted under color of state law.

7.      Defendant Michigan Department of Natural Resources ("DNR") is a state agency and a subsidiary of Michigan's executive branch of government, and it is only being named as a defendant here in pursuit of available injunctive relief and just compensation pursuant to an unconstitutional taking. Defendant DNR is not being sued for damages.

8.      This Court has original jurisdiction under Article III of the United States Constitution and 28 U.S.C. § 1331.

9.      Plaintiffs seek declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and a preliminary injunction under the All Writs Act, 28 U.S.C. § 1651, relief which is within this Court's subject matter jurisdiction.

10.     This Court has general personal jurisdiction over Defendants pursuant to Michigan's long-arm statute, M.C.L. § 600.701(1) and (2).

11.     This Court, in any event, has limited personal jurisdiction over Defendants under M.C.L. § § 600.705(1) and (3).

12.     Venue is proper in this forum under 28 U.S.C. § § 1391(b)(1) and (2) because Defendants reside in this judicial district, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

## REGULATION OF COMMERCIAL FISHING IN MICHIGAN

13.     In Michigan, commercial fishing on the Great Lakes is prohibited absent a license issued by the State's DNR.  Michigan law provides, in pertinent part:

> All fish of whatever kind found in the waters of Lakes Superior, Michigan, Huron, and Erie, commonly known as the Great Lakes, the bays of the Great Lakes, and the connecting waters between those lakes within the jurisdiction of this state are the property of the state, and taking the fish from those waters is a privilege. All fish in waters described in this section shall be taken, transported, sold, and possessed only in accordance with this part. [M.C.L. § 324.47301.]

14.     The Michigan Legislature vested the DNR with sole authority to regulate commercial fishing in Michigan, including through the issuance of commercial fishing licenses. *See* M.C.L. §§ 324.47302(1), 324.47331(1).

15.     Thus, the DNR is the lone gatekeeper for who may engage in commercial fishing on the Great Lakes in its waters within Michigan's boundaries.

4

16.     The DNR is also authorized to "promulgate rules as may be necessary" pursuant to the Michigan Administrative Procedures Act of 1969, M.C.L. 24.201, *et seq.*, for the purpose of carrying out only M.C.L. 324.47302 (governing issuance of licenses) and M.C.L. § 324.47303 (governing remuneration).  M.C.L. § 324.47305.

17.     While the DNR wields the limited authority to issue commercial fishing licenses under Sections 324.47302(1) and 324.47331(1), and to promulgate administrative rules under Section 324.47305, the DNR also takes it upon itself to issue so-called "Fishing Orders" to suspend, abridge, and/or alter Michigan's statutory authority regarding commercial fishing.

18.     From around 2015 to present, the DNR has issued, at least, Fishing Orders 243-15 through 243-21, many of which conflict with actual Michigan law.  The DNR does this on its own whims under M.C.L. § 324.46701, which is discussed in greater detail below.

19.     In conjunction with its authority to issue licenses, the DNR also exercises extraordinary authority over nearly every aspect of a licensee's business, including use of a certain "kind of boat, tug, or launch, including the number of and kind of net or nets for which the license was issued," M.C.L. § 324.47331(1), the "amount of fish to be taken by species and kind," M.C.L. § 324.47302(2)(a), "the areas in which the licensee is permitted to fish," M.C.L. § 324.47302(2)(b), "the season when and the depths where the licensee may conduct commercial fishing operations," M.C.L. § 324.47302(2)(c), and "the methods and gear that the licensee shall use," M.C.L. § 324.47302(2)(d).

20. The DNR thus dictates the geographic region, or "zone," within which each licensee is designated to fish, as well as an annual "quota" that caps the amount of any species permitted to be taken.

21. The DNR also has enforcement authority concerning commercial fishing licenses. For example, it may "[s]pecify other conditions, terms, and restrictions *that are considered necessary in implementing this part*, including, but not limited to, the right to inspect the licensee's fishing operations in the waters, on board, or ashore." M.C.L. § 324.47302(2)(e) (emphasis added).

22. In addition, licensees must comply with the general season schedules set forth under M.C.L. § 324.47311.

23. And licensees face natural limitations on which species they can take by virtue of the zone restrictions that the DNR places on each license. Certain species populate each zone more than others, and species may migrate among zones depending on the season.

24. These natural realities are the reason commercial fishermen are permitted by statute to take certain species while the DNR—based on actual scientific data and research—may dictate when and where those statutorily authorized species may be taken. That is, if the DNR were actually complying with and carrying out its lawful duties.

25. Illustratively, Native peoples and Canadian commercial fishermen fish the same Great Lakes that Michigan commercial fisherman do. Native peoples and Canadian commercial fishermen are still authorized to fish the species Michigan commercial fishermen are by statute—like lake trout, walleye, and perch—but that the DNR has

6

unilaterally barred Michigan commercial fishermen from taking. Thus, in a nutshell, the "science" on the Great Lakes doesn't change based on data or conditions because it's all one body of water. Rather, the "science" changes based on whether the commercial fishermen—like Dana and Bailey—are holding a Michigan commercial fishing license, a Canadian commercial fishing license, or are those Native peoples fishing the same waters.

26.    Nevertheless, similar to other types of commercial licenses, commercial fishing licenses are generally transferable, with certain limitations. *See generally* M.C.L. § 324.47331(1)(b) (authorizing the DNR to permit, "[i]n case of the sale or the transfer of the title of any licensed boat, transfer the license to the new owner or owners"); M.C.L. § 324.47331(2) ("[t]he owner of any licensed boat acquired from the estate of a deceased licensee or as a result of bankruptcy proceedings may, in addition to having the license transferred in his or her name, have a port of his or her choice designated in the license.")

27.    M.C.L. § 324.47302(1) governs the qualification standards for licensees:

> In determining the qualifications of the licensees, the department shall consider the kind, nature, and condition of the boats and fishing equipment and gear to be used by the applicant, the years of experience the applicant has had in commercial fishing, and the quantity and kinds of fish that the applicant has caught during the previous 5 years, and other facts that may assist the department in determining that the applicant is capable of engaging in commercial fishing in a proper and profitable manner and will comply with the laws applicable to commercial fishing.

28.    "Any licensee licensed on November 15, 1968 has the right to have his or her license renewed from year to year," so long as the "licensee continues to meet the qualifications set forth in [M.C.L. § 324.47302(1)] and the qualifications specified in any

rules promulgated under this section *regardless of the determination of the number of licenses to be issued under this part. . . ."* M.C.L. § 324.47302(5). (emphasis added).

29.     All commercial fishing licenses issued under M.C.L. § 324.47302—whether they originally predate November 15, 1968— "expire on December 31 of the year in which issued." M.C.L. § 324.47302(3).

30.     Hence, while no commercial fishing licenses issued under M.C.L. § 324.47302 are automatically renewable per se, one who commits no violation of Michigan law that governs commercial fishing and holds a license that predates 1968 can expect that license (or those licenses) to be automatically renewed pursuant to M.C.L. § 324.47302(5).

31.     And the same goes for licensees who hold a Michigan commercial fishing license issued after 1968. Indeed, as binding jurisprudence regarding commercial licenses, constitutional due process, and constitutional takings has evolved since 1968, a licensee who holds a post-1968 Michigan commercial fishing license can reasonably expect automatic renewal of that license so long as (1) the DNR determined based on actual data that the fisheries can support the additional license, and (2) the licensee did not violate Michigan commercial fishing law. *See* M.C.L. § 324.47302(1); *see also Pinebrook Warren, LLC v City of Warren*, ___ Mich App ___, ___ (2022), slip op at 10, citing *Bundo v City of Walled Lake* 395 Mich 679, 688-696 (1976) (holding that federal and state constitutionally protected property interests attach to a Michigan commercial license).

32.     The DNR's revocation authority is strictly limited under M.C.L. § 324.47302(4), which mandates a license cannot be arbitrarily stripped:

The department may suspend or revoke any license issued under this part *if the licensee fails to fulfill or violates any of the conditions, terms, or restrictions of the license.* The department shall afford the licensee a hearing in accordance with the administrative procedures act of 1969, Act No. 306 of the Public Acts of 1969, being sections 24.201 to 24.328 of the Michigan Compiled Laws. Any person whose license has been suspended or revoked is not eligible to apply for or receive a license for the ensuing 2 calendar years following the suspension or revocation. [emphasis added.]

33.     The DNR must follow Michigan's Administrative Procedures Act ("APA") to strip a licensee of a commercial fishing license. *See Id.*

34.     Because commercial fishing licenses are issued to a "person," M.C.L. §§ 324.47331(1), 324.47302(1), licensees typically use those licenses to operate commercial fishing enterprises, like Dana and Bailey (licensees) do through LFC (a corporate entity).

35.     The DNR wields broad legal authority to limit the number of commercial fishing licenses it issues to individuals. Such limitations must be based on scientific research and hard data, and limitations cannot be arbitrary and capricious.

36.     These imposed limitations are a means to reasonably facilitate a stable, therefore economical and profitable, commercial fishing industry in Michigan:

Notwithstanding the provisions of this or any other part or act, the department, when in the department's opinion it is necessary for the ***better protection, preservation, management, harvesting, and utilization of the fisheries*** in the waters described in section [M.C.L. § 324.47301] may limit the number of fishing licenses to be issued under this part and fix and determine the qualifications of persons to whom licenses are issued. In determining the number of licenses that the department issues during any license year, the department shall consider the number of persons holding licenses, the number of licensees needed to harvest the fish known or believed to be harvestable, the capacity of the boats and equipment owned and used by licensees to harvest those fish, and any other facts that may bear upon the allowing of a limited number of licensed persons to engage in commercial fishing ***in an economical and profitable manner***. . . . [M.C.L. § 324.47302(1) (emphasis added).]

9

37.    In contrast, nowhere in the statutory scheme governing commercial fishing in Michigan does the phrase "sustainable, profitable and ***socially acceptable***" appear.

38.    Put simply, the statutory scheme governing commercial fishing in Michigan is predicated on the notion that the fish population in the Great Lakes should be maintained by the DNR in such a way that specifically facilitates commercial fishermen to harvest this abundant natural resource so that it may be brought to market in a responsible yet profitable manner.

39.    The DNR has exercised this statutory authority by issuing commercial fishing licenses since the 1960s.

40.    However, times change, and so do the ideological motivations of governmental agencies like the DNR, *e.g.* the DNR's desire to destroy commercial fishing on behalf of so-called "sport fishing."

41.    And within Michigan's statutory scheme is embedded a weapon of mass destruction that purports to grant unilateral authority to the DNR, which it now uses to achieve its destructive end:

> *Notwithstanding any other act or part to the contrary, any statute or law of this state governing commercial fishing may be suspended, abridged, extended, or modified by the department when, in the opinion of the department, that action is necessary for the better protection, preservation, maintenance, and harvesting of the fish. The existing statutes and laws regulating commercial fishing shall remain in full force and effect unless suspended, abridged, extended, or modified by order of the department in the manner provided in this part or by subsequent acts of the legislature.* [M.C.L. § 324.46701 (emphasis added).]

42.    Given that there is no other known authority that would purport to justify the DNR's treatment of commercial fishermen in Michigan, like Dana and Bailey, this statute

10

must be the DNR's justification to suspend Dana's and Bailey's constitutional rights as they related to commercial fishing, as stated below.

43. To date, Section 324.46701 has never been subjected to meaningful constitutional scrutiny, nor the decades' of jurisprudence defining Fourteenth Amendment Due Process, Fifth Amendment Takings, and First Amendment retaliation violations since Section 324.46701's enactment.

## GENERAL ALLEGATIONS

44. Plaintiffs incorporate by reference each preceding paragraph as if fully restated.

45. Since the 1990s, Dana has held several DNR-issued commercial fishing licenses and used them to operate LFC.

46. Dana's son Bailey is now a co-licensee on these DNR-issued commercial fishing licenses.

47. Dana formerly conducted licensed commercial fishing operations with his father, who was a commercial fisherman dating back to the 1960s.

48. Bailey now operates LFC with Dana. Bailey intends to carry on the family's commercial fishing business when Dana retires. Put simply, this is a family business.

49. Dana and Bailey hold Michigan commercial fishing licenses to fish various parts of Lake Huron for whitefish and perch within Saginaw Bay, among other species.

50. Going back to at least the 1990s, the DNR has targeted commercial fishermen, like Dana and Bailey, for removal from Saginaw Bay so that so-called "sport fishermen" could be given preference over commercial fishermen.

51.    Of particular interest to the DNR's scheme is to grant sport fishermen sole access to perch fishing in Saginaw Bay.

52.    Indeed, this fact is documented within Michigan's jurisprudence.  The DNR first attempted to bar commercial fishing as it relates to perch in Saginaw Bay via executive fiat.  *See* **Exhibit A**, *Bay Port Fish Co., et al. v Michigan Department of Natural Resources*, unpublished opinion per curiam of the Court of Appeals, issued Aug. 23, 1994 (Docket No. 145300), pp 1-3.

53.    In *Bay Port*, "the parties stipulated that there is no biological need to restrict the taking of perch [in Saginaw Bay].  The DNR cite[d] a 'user conflict between sports fishermen and commercial fishermen, and [its] belief that sport fishermen would have more opportunity to catch larger perch if the commercial fishing [in Saginaw Bay] were curtailed."  *Id.* at 2.

54.    Pursuant to a DNR rule that goes back to at least the 1970s, the only place within Michigan's jurisdiction on the Great Lakes where perch may be taken by commercial fishermen is in Saginaw Bay.  *See* **Exhibit A**, *Bay Port Fish Co.,* unpub op at 3; Mich Admin Code, Rs 299.815(a), 299.1074(1)(f), 299.1074(1)(g).

55.    While Michigan statute permits the taking of perch on the Great Lakes, *see* M.C.L. § 324.47319(1)(d), the DNR used its unconstitutionally broad statutory authority under M.C.L. § 324.46701 to "suspend" and "supersede" the statute on commercial fishing of perch within Michigan's jurisdictional boundaries of the Great Lakes.

56.    But the DNR couldn't unilaterally bar commercial fishing of perch in Saginaw Bay through executive fiat because those licenses for perch predated 1968 as they

12

are automatically renewed, and the DNR had zero scientific data to justify its prohibition on the commercial fishing of perch in Saginaw Bay. *See* M.C.L. § 324.47302(5); **Exhibit A,** *Bay Port Fish Co.,* unpub op at 2.

57.     So, after the DNR lost in court as it relates to perch in Saginaw Bay back in 1994, the DNR over the years revised its plot into at least a two-pronged scheme to favor sport fishermen over commercial fishermen in Saginaw Bay: (1) kill the perch population that sustains commercial fishing in Saginaw Bay by introducing roughly twenty-six million walleye into Saginaw Bay (*see generally* **Exhibit B**, DNR Data on Walleye 1985-2019, pp 1-95), and (2) attempt to bait Dana, the lone commercial fisherman holdout in Saginaw Bay, into an agreement to relinquish his commercial fishing rights in Saginaw Bay once his perch licenses became less profitable due to the walleye preying on the perch. (*See* **Exhibit C,** 1998 Experimental Rep. on Walleye-Perch Management) ("[H]igh mortality of both juvenile and adult perch was due to walleye predation.")

### Dana's and Bailey's Pre-1968 Saginaw Bay Licenses

58.     "Saginaw Bay" is defined as "those waters lying inside of a line drawn from Tawas point lighthouse in Iosco county to a monument which shall be erected by the department on Oak point in Huron county, including the waters of Tawas bay . . . ." M.C.L. § 324.47339(1).

59.     Dana and Bailey hold the following commercial fishing licenses for Saginaw Bay, all of which existed before 1968 and were either held by Dana's father or were purchased by Dana from other commercial fishermen: **Exhibit D**, License No. 702; **Exhibit E**, License No. 800; **Exhibit F**, License No. 807; **Exhibit G**, License No. License No. 809;

13

**Exhibit H**, License No. 814; **Exhibit I**, License No. 1101; **Exhibit J**, License No. 1119; **Exhibit K**, License No. 1122 (collectively, the "Saginaw Bay Licenses").

60.    Under M.C.L. § 324.47302(5), because Dana's father and/or his contemporaries were "licensee[s] licensed on November 15, 1968," those licensee/s had "the right to have [their] license renewed from year to year," so long as they satisfied the qualifications set forth in Section 47302 and the qualifications specified in any rules promulgated under that section, "regardless of the determination of the number of licenses to be issued under" it.

61.    Given that the licenses described in Section 47302 are not transferable without the permission of the DNR, Dana received such permission to become the transferee of the Saginaw Bay Licenses.

62.    Of the eight commercial fishing licenses for Saginaw Bay, four are at issue here and all four authorize commercial fishing for perch in Saginaw Bay: (1) License 807 (**Exhibit F**), (2) License 814 (**Exhibit H**), (3) License 1119 (**Exhibit J**), and (4) License 1122 (**Exhibit K**). These licenses have long been targeted by the DNR.

63.    Indeed, back in or around 2009, Dana sued the DNR with the hopes of being authorized to fish for walleye in Saginaw Bay. He did so because the DNR's saturation of walleye had greatly diminished the value of Dana's and Bailey's perch licenses due to the DNR's intentional destruction of Saginaw Bay's natural perch population. (*See* **Exhibit B**, DNR Data on Walleye 1985-2019, pp 1-95; *c.f.* **Exhibit C**, 1998 Experimental Rep. on Walleye-Perch Management.)

14

64.    The gist of that lawsuit was the DNR—knowing it had destroyed the perch population in Saginaw Bay—utilized its weapon of mass destruction in M.C.L. § 324.46701 to subvert Michigan's statutory authority that allows for the commercial fishing of walleye, *see* M.C.L. § 324.47319(1)(h), to prohibit commercial fishermen to take walleye anywhere on the Great Lakes, and had done so with zero credible scientific data to support its conclusion.[1]

65.    Rather than base its decisions on tried and true scientific data as it relates to walleye, the DNR again picked so-called "sport fishing" as the priority in Saginaw Bay over commercial fishing and refused to budge.

66.    And "several walleye groups," *i.e.* sport fishermen, contacted or coordinated with Defendant James Dexter—according to Dexter himself—and Defendant Thomas Goniea on or about December 4, 2009, at 5:00 PM to help the DNR in its effort to remove Dana and Bailey, and their commercial fishing operation/s, out of Saginaw Bay. (**Exhibit L**, 12/4/09 Email.)

67.    Ultimately Dana's lawsuit seeking to replace his lost perch with walleye proved unsuccessful at the time.

68.    Accordingly, Dana's and Bailey's four perch licenses in Saginaw Bay continued to depreciate in value, which gave the DNR the perfect opportunity to revisit its 1994 court loss with regard to commercial fishing in Saginaw Bay.

**The Harbor Beach License**

---

[1] A "[p]ike-perch (yellow pickerel)" as referenced in M.C.L. § 324.47319(1)(h) is what's commonly referred to as a "walleye."

IBUTZEL\000161882\0001\100261302.v3-4/21/23

69.    Harbor Beach is a city in Huron County, Michigan, which fronts a portion of Lake Huron and is therefore part of "the Great Lakes, the bays of the Great Lakes, and the connecting waters between those lakes within the jurisdiction of this state," M.C.L. § 324.47301.

70.    Back in 2008, in the hopes of keeping LFC profitable by providing all Michiganders the opportunity to purchase whitefish at market, Dana sought a research permit under M.C.L. § 324.47315 to take whitefish out of the Harbor Beach fishery.

71.    The DNR, through Defendants, finally granted Dana's request in 2015 and issued a research permit to both Dana and Bailey. (See generally **Exhibit M**, Permit No. 702-WF-15, pp 1-5.)

72.    In addition to legitimate research purposes as outlined in M.C.L. § 324.47315 and consistent with its previously unsuccessful attack on commercial fishing in Saginaw Bay, the DNR, through Defendants, listed its real objective in issuing the research permit: "*To permanently remove state commercial fishing licenses and associated fishing gear from Saginaw Bay* with an emphasis on removing small mesh trap nets.    Specifically, permanently retire Saginaw Bay commercial fishing licenses 807, 814, 1119, and 1122 and all listed commercial fishing gear." (**Exhibit M**, Permit No. 702-WF-15, p 1) (emphasis added.)

73.    Dana and Bailey signed the research permit, and so did Defendant James Dexter of the DNR. (*See Id.*, p 5.)

16

74.     Dana and Bailey did not agree to permanently retire any commercial fishing licenses at that time but agreed not to use their pre-1968 perch licenses 807, 814, 1119, and 1122 in Saginaw Bay while fishing Harbor Beach License No. 1150.

75.     The DNR issued virtually the same research permit through 2019, and Dana's and Bailey's returned data related to Harbor Beach resulted in the DNR making the determination that a permanent commercial fishing license is sustainable at Harbor Beach.

76.     Accordingly, Dana and Bailey applied for an official license for a Harbor Beach license. (*See* **Exhibit N**, 4/10/20 Application.)

77.     On April 10, 2020, the DNR issued License No. 1150 to Dana and Bailey, authorizing commercial fishing with large mesh trap nets in specified waters off Harbor Beach, for the season between January 1 through October 31, and from December 1 through December 31. (*See generally* **Exhibit O,** 2020 License No. 1150, pp 1-3.)

78.     License No. 1150 authorized Dana and Bailey, pursuant to the statutory parameters related to whitefish specifically, to "retain all whitefish 17 inches or greater in total length as well as all other legal commercial fish species." (*Id.*, p 3, § 10).

79.     What the DNR meant by "all other legal commercial fish species" is those it has determined to be "legal" via executive fiat, not what is "legal" by statute.

80.     License No. 1150 further stated in pertinent part as follows:

> By accepting this license, the licensees agree not to set or tend any of the listed gear or harvest any fish under state commercial fishing licenses 807, 814, 1119, and 1122 in Saginaw Bay. Additionally, the ownership of these four licenses shall not be transferred while this license remains valid.
>
> This license expires on December 31, 2021 and is not subject to automatic renewal upon expiration. ***Renewal of this license is conditional on***

17

*negotiations between the licensees and the State of Michigan of a permanent
license at Harbor Beach after the passage of a new Commercial Fishing Statute.*
The State of Michigan and/or the licensees may reject future issuance of this
license without cause until such a time that the permanent license has been
negotiated.  [(*Id.*, p 3, §§ 14-15) (emphasis added).]

81.    Dana signed the license—Bailey did not. (*See Id.*, p 3.)

82.    On information and belief, Defendant James Dexter signed the license.

83.    The DNR renewed License No. 1150 on March 3, 2021, with the same future

promise to negotiate language in it. (*See* **Exhibit P,** 2021 License No. 1150, pp 1-3.)

84.    On February 18, 2022, once again co-licensees Dana and Bailey applied for

renewal of their License No. 1150. (*See* **Exhibit Q,** 2/18/22 Application.)

85.    On February 18, 2022, Dana and Bailey also applied for the renewal of their

pre-1968 perch licenses 807, 814, 1119, and 1122 in Saginaw Bay along with all of their

other commercial fishing licenses in order to keep them up to date. (*See* **Exhibit R,** 2022

License No.s 807, 814, 1119, and 1122 Applications.)

86.    In response, Defendant Goniea submitted Dana an ultimatum: Relinquish

and permanently retire License No.s 807, 814, 1119, and 1122 in Saginaw Bay, or

Defendants would not renew the Harbor Beach License No. 1150. (*See* **Exhibit S,** 3/28/22

Email, pp 1-2.)

87.    Defendant    Goniea    pontificated—without    any    statutory    authority

whatsoever—that a permanent whitefish license at Harbor Beach is not only profitable and

sustainable, but also "socially acceptable."  (*Id.*, p 1.)

88.    In other words, fishing whitefish at Harbor Beach would serve Defendants'

end of removing commercial fishing from Saginaw Bay in favor of sport fishing.

18

89.    Dana responded and informed Defendant Goniea and the DNR that he never intended to leave his business's fate in the hands of the DNR, given that a "profitable commercial fishery has a great deal to do with the management decisions that the MDNR makes," like when it chose to kill much of the perch in Saginaw Bay with its roughly twenty-six million walleye dump over the years. (**Exhibit T**, 4/6/22 Email; *see also* **Exhibit B**, DNR Data on Walleye 1985-2019, pp 1-95.)

90.    As such, Dana explained he would continue to "exchange," *i.e.* not use, License No.s 807, 814, 1119, and 1122 in Saginaw Bay, but would never agree to permanently give the four pre-1968 licenses up for one post-1968 Harbor Beach license. (**Exhibit T**, 4/6/22 Email.)

91.    Dana had used the word "exchange" in reference to a Harbor Beach permit or license back in 2011 and 2012, and suggested exchanging his Saginaw Bay License No.s 807, 814, and 1122 for a "permit/license."    But Dana never said he wanted to "permanently retire" any license. (*See* **Exhibit U**, 9/9/11 Letter; **Exhibit V**, 3/8/12 Letter.)

92.    And no reasonable person would conclude that the word "exchange" in this context would mean to permanently relinquish four pre-1968 licenses with the right to automatic renewal regardless of the number of licenses issued by the DNR for one post-1968 "permit" or "license."    Given the history here as documented, nobody in their right mind would trust that the DNR wouldn't try to rip the rug from under them on a whim.

93.    In fact, the reason for Dana's suggestion was that the DNR had killed most of the perch in Saginaw Bay with its massive walleye dump, so Dana hoped to be able to

recoup those lost revenues in other areas, like Harbor Beach, which ultimately may have helped boost Michigan's economy. (*See e.g.* **Exhibit W**, 3/5/08 Letter.)

94.     On April 21, 2022, Defendant Goniea, while including Defendants Dexter and Herbst, responded to Dana and chastised him for not jumping at the opportunity to relinquish License No.s 807, 814, 1119, and 1122 in Saginaw Bay. (*See* **Exhibit X**, 4/21/22 Letter, pp 1-3.)

95.     Nevertheless, Defendant Goniea and the DNR reluctantly issued Dana and Bailey all of their commercial fishing licenses in Saginaw Bay for 2022.

96.     Throughout this entire exchange, the DNR, Defendant Dexter, Defendant Herbst, nor Defendant Goniea acknowledged Bailey's property interest in License No.s 807, 814, 1119, 1122, and 1150.

97.     Nor did they contact Bailey regarding any supposed agreement for Bailey to relinquish his property interests in the Saginaw Bay licenses or the Harbor Beach license as a co-licensee.

98.     The DNR reluctantly renewed License No. 1150 on March 16, 2022, with the same future promise to negotiate language in it, and Defendant Seth Herbst signed it on behalf of Defendant James Dexter. (*See* **Exhibit Y,** 2022 License No. 1150, pp 1-3.)

99.     Nearly one year later, Defendant Goniea sent Dana another letter demanding Dana either "permanently relinquish[  ] Saginaw Bay licenses 807, 814, 1119, and 1122" or lose "authorization to fish at Harbor Beach . . . ." (**Exhibit Z**, 1/30/23 Letter, p 1.)

20

100. On February 8, 2023, one of Dana's above-captioned attorneys responded to the DNR and explained, among other things, that the actions of Defendants Dexter, Herbst, and Goniea were blatantly unconstitutional. (*See* **Exhibit AA**, 2/8/23 Letter, pp 3-4.)

101. On March 2, 2023, the Michigan Department of Attorney General ("the AG"), responded to Dana's attorney and appeared to argue that Dana and the DNR had entered into an enforceable and binding contract. (*See* **Exhibit BB**, 3/2/23 Letter, pp 1-3.) The AG, an executive office charged with careful application of executive authority, failed to meaningfully address any of Dana's constitutional concerns. (*See Id.*)

102. Seemingly based on the documentary evidence attached to this complaint, the AG proclaimed that Dana agreed to permanently "surrender[ ] [Dana's and Bailey's] existing [Saginaw Bay] licenses [807, 814, 1119, and 1122]" in exchange for one Harbor Beach license. (*Id.*, p 2.)

103. The AG explained that "[b]ecause [Dana] has made it clear that he does not wish to relinquish the inner [Saginaw] Bay licenses (Licenses 807, 814, 1119, and 1122), the Department [*i.e.* Defendants DNR, Dexter, Herbst, and Goniea] will no longer authorize [Dana] to fish at Harbor Beach." (*Id.*)

104. While the AG seemed to rely on basic contract law for its conclusion, no doubt the AG's advice to the DNR and Defendants Dexter, Herbst, and Goniea, she neglected to mention Bailey Serafin's property interests and rights in License No.s 807, 814, 1119, 1122, and 1150. (See *Id.*, pp 1-3.)

105. Further, the AG failed to acknowledge the fact that Bailey Serafin never signed the DNR's license that purported to agree to some undefined thing at a future date

21

"after the passage of a new Commercial Fishing Statute." (**Exhibit P,** 2021 License No.

1150, pp 1-3; *see also* **Exhibit Y,** 2022 License No. 1150, pp 1-3.)

106. No such "new Commercial Fishing Statute" passed in Michigan, and the

above-cited statutory scheme remains in full effect. (*Id.*)

107. The AG copied Defendants Dexter, Herbst, and Goniea to the letter telling

Dana they were stripping Dana of his and Bailey's Harbor Beach license for Dana's refusal

to capitulate. (*See* **Exhibit BB,** 3/2/23 Letter, pp 1-3.)

108. Defendants did not issue neither Dana nor Bailey the Harbor Beach License

No. 1150 for the 2023 commercial fishing year.

109. Defendants DNR, Dexter, Herbst, nor Goniea afforded Dana or Bailey any

formal or informal process regarding any of these licenses.

110. Tellingly, neither Defendants DNR, Dexter, Herbst, or Goniea filed suit to

enforce the purported "agreement" used to justify their treatment of Dana and Bailey.

111. Rather, the attached emails and letters is how Defendants Dexter, Herbst,

and Goniea chose to carry out their charge as executive officers of Michigan's government.

112. LFC, through Dana and Bailey, invested approximately $2,000,000 in a

boat, equipment, labor hours to build this custom equipment, etc., to fish Harbor Beach.

113. In an effort to mitigate damages, Dana requested to transfer LFC's boat used

for Harbor Beach onto a different Saginaw Bay license in the hopes some fish may be taken

with it.

114. Over the past eight years Harbor Beach License No. 1150 generated, on

average, approximately $462,419.69 per year in gross revenues.

22

115.    Bailey is in his early twenties and, if Bailey fishes as long as his father and grandfather, reasonably has another forty-five years of commercial fishing.

116.    Bailey is a recognized co-licensee in the licenses at issue and is therefore entitled to constitutional protections and just compensation for any taking conducted by the DNR.  (*See e.g.* **Exhibit CC**, 3/24/05 Letter, pp 1-2) (Defendant Goniea recognizing Bailey as a co-licensee in License No. 702.)

117.    As such, the reasonable value of Harbor Beach License No. 1150 is roughly $20,808,886.00, plus the roughly $2,000,000.00 capital investment for the boat, gear, equipment, labor, etc., needed for harvest: $22,808,886.00.

### COUNTS I & II
### 42 U.S.C. § 1983
### DEPRIVATION OF PROCEDURAL DUE PROCESS

118.    Plaintiff incorporates each preceding paragraph as if fully restated.

119.    These counts are pled against Defendants Dexter, Herbst, and Goniea in their individual (damages) and official (injunctive relief) capacities pursuant to 42 U.S.C. § 1983 as all three are "persons" who deprived Dana and Bailey of their constitutional rights while acting under the color of law.

120.    In relevant part, the Fourteenth Amendment to the U.S. Constitution reads:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. ***No State shall . . . deprive any person of . . . property, without due process of law . . . .*** [US Const, Am XIV § 1 (emphasis added).]

121.    To establish a procedural due process violation, the plaintiff must demonstrate "[1] a constitutionally protected . . . property interest and show that [2] such

23

an interest was deprived [3] without appropriate process." *Midkiff v Adams County Regional Water District*, 409 F.3d 758, 762 (6th Cir. 2005) (internal citations omitted).

122.    Under Michigan law, which establishes property rights for the purposes of a federal due process claim, "once the government issues a [commercial] license, the holder[s] of a licenses ha[ve] a sufficient property interest in the license to invoke the protections of the Due Process Clause." *Pinebrook Warren, LLC v City of Warren*, ___ Mich App ___, ___ (2022), slip op at 10, citing *Bundo v City of Walled Lake* 395 Mich 679, 688-696 (1976).    Thus, the holder of a commercial license in Michigan is guaranteed constitutionally protected due process. *See Id.*

123.    With regard to a commercial fishing license, the DNR is charged with issuing such licenses as outlined in M.C.L. § 324.47302(1).

124.    Pursuant to the DNR's administrative rule, "An application for a commercial fishing license shall be made not less than 30 days before fishing operations are expected to commence." Mich Admin Code, R 299.1071(1).

125.    "To be eligible for a license, an applicant shall have been issued a Michigan commercial fishing license for the immediately preceding year." Mich Admin Code, R 299.1071(2).

126.    In other words, commercial fishing license holders are automatically eligible for renewal of their commercial fishing license/s so long as their renewal applications are timely submitted. *See* M.C.L. § 324.47302(1); *Pinebrook*, slip op at 10; Mich Admin Code, Rs 299.1071(1), (2).

24

127.   In this case, Dana and Bailey have long held Michigan commercial fishing licenses. Virtually all of these commercial fishing licenses have been renewed without complication for decades.

128.   On January 30, 2023, Defendants issued Dana and Bailey an ultimatum: permanently relinquish their Saginaw Bay License No.s 807, 814, 1119, and 1122 or lose forever Harbor Beach License No. 1150. (*See* **Exhibit Z**, 1/30/23 Letter, pp 1-2.)

129.   Dana and Bailey timely submitted their renewal applications for all of their commercial fishing licenses, including License No.s 807, 814, 1119, 1122, and 1150 pursuant to the process laid out in M.C.L. §§ 324.47302(1), 324.47329 and Mich Admin Code, Rs 299.1071(1), (2).

130.   Defendants refused to issue Dana and Bailey their License No. 1150 and cited a purported "agreement" between Dana and Defendants to justify Defendants' refusal. (**Exhibit Z**, 1/30/23 Letter, pp 1-2; **Exhibit AA**, 2/8/23 Letter, pp 3-4.)

131.   The referenced "agreement" is not an enforceable contract in Michigan, and therefore not binding on Dana.

132.   Even if it were an enforceable contract (and it's absolutely not), the condition precedent for Dana's performance, *i.e.* "the passage of a new Commercial Fishing Statute," never happened thereby making Dana's performance of the purported contract impossible to perform. (**Exhibit O,** 2020 License No. 1150, p 3, §§ 14-15.)

133.   What's more, Bailey never signed any supposed agreement regarding Harbor Beach License No. 1150, or Saginaw Bay License No.s 807, 814, 1119, and 1122. And

25

Bailey has an equal property interest to Dana in all licenses in which Bailey is a co-licensee. (*See e.g.* **Exhibit CC**, 3/24/05 Letter, pp 1-2.)

134.    Defendants—and their attorneys at the Michigan Department of Attorney General—must know that Bailey has an equal property right/interest in those licenses because all transfers that added Bailey to those licenses were approved by Defendants and the DNR pursuant to statute. *See* M.C.L. § 324.47302(5) ("Licenses described in this section are not transferable without the permission of the department."); *c.f.* (**Exhibit CC**, 3/24/05 Letter, pp 1-2.).

135.    Therefore, pretending the purported contract on License No. 1150 could be theoretically enforceable for argument sake (and again it's not as a matter of law), Bailey would have had to also sign and agree to transfer his property interests and waive his constitutional rights in those licenses along with Dana; Bailey didn't.

136.    Notwithstanding the fact there's no enforceable contract regarding any commercial fishing license, Defendants never provided Dana or Bailey any due process to address Defendants' refusal to renew Harbor Beach License No. 1150.

137.    Rather, Defendants used M.C.L. § 324.46701 to unilaterally suspend, abridge, extend, and/or modify Dana's and Bailey's constitutional rights to due process as provided by statute and administrative rule.

138.    Defendants—and their attorneys at the Michigan Department of Attorney General—know or should have known that M.C.L. § 324.46701 cannot be used to chill or subvert Dana's and Bailey's constitutional rights.

IBUTZEL\000161882\0001\100261302.v3-4/21/23

WHEREFORE, this Court should find that Defendants James Dexter, Seth Herbst, and Thomas Goniea violated Plaintiffs Dana Serafin's and Bailey Serafin's well-established constitutional right to procedural due process under the Fourteenth Amendment to the U.S. Constitution. This Court should then enjoin Defendants by ordering that Harbor Beach License No. 1150 be immediately reissued to Plaintiffs. In the alternative, this Court should order Defendants to immediately reissue Harbor Beach License No. 1150 to Plaintiff Bailey Serafin. And, pursuant to 42 U.S.C. § 1988(b), this Court should order Defendants to pay Plaintiffs' reasonable attorneys' fees and costs associated with adjudicating this complaint.

## COUNT III
### 42 U.S.C. § 1983
### UNCONSTITUTIONAL CONDITIONS RESULTING IN A TAKING

139. Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated.

140. In relevant part, the Fifth Amendment to the U.S. Constitution reads, "[P]rivate property [shall not] be taken for public use, without just compensation." US Const, Am XIV. This so-called "takings clause" is applied to the State of Michigan via the Fourteenth Amendment to the U.S. Constitution: "No State shall . . . deprive any person of . . . property, without due process of law . . . ." US Const, Am XIV § 1.

141. Within the context of a state's decisions regarding a permit and/or a license, the Fifth Amendment bars the state and its agents from placing "unconstitutional

27

conditions" on the use or exercise of one's property rights. *See e.g. Koontz v St. Johns River Water Management Dist.*, 570 US 595, 604-606 (2013) (internal citations omitted).

142.    In other words, the state and its agents may not "engag[e] in 'out-and-out ... extortion' that would thwart the Fifth Amendment right to just compensation" by wielding legitimate governmental authority to suit its arbitrary ends. *Id.* at 606 (internal citations omitted).

143.    Here, Dana and Bailey have long-established property rights in their Michigan commercial fishing licenses. *See Pinebrook*, slip op at 10.

144.    Defendants DNR, Dexter, Herbst, and Goniea know this else they would have never had to concoct their underhanded scheme in an attempt to remove Saginaw Bay License No.s 807, 814, 1119, and 1122; Defendants would have just unilaterally stripped Dana and Bailey of those licenses.

145.    Indeed, Saginaw Bay License No.s 807, 814, 1119, and 1122 carry with them both protected property rights under Michigan law, and are subject to automatic renewal in perpetuity because these licenses preexisted 1968.

146.    The DNR and Defendants Dexter, Herbst, and Goniea had already determined that the portions of the Great Lakes within Michigan's jurisdiction could sustain commercial fishing for all of Dana's and Bailey's commercial fishing licenses—including Harbor Beach License No. 1150 for the 2023 commercial fishing season.

147.    Nevertheless, Defendants unconstitutionally conditioned renewal and continued use of Harbor Beach License No. 1150 on relinquishment of Dana's and Bailey's four Saginaw Bay License No.s 807, 814, 1119, and 1122.

IBUTZEL\000161882\0001\100261302.v3-4/21/23

148.   Put plainly, the attached documentary evidence proves that Defendants have committed a series of egregious abuses of executive power to "extort[ ]" Dana and Bailey out of their four Saginaw Bay licenses. *Koontz*, 570 US at 606.

149.   Defendants engaged in this conduct not for any legitimate purpose, but to favor sport fishermen over commercial fishermen—even though commercial fishermen provide more Michiganders with access to these species of fish than do sport fishermen. *See* **Exhibit A**, *Bay Port Fish Co.,* unpub op at 1-3; (**Exhibit B**, DNR Data on Walleye 1985-2019, pp 1-95; **Exhibit L**, 12/4/09 Email.).

150.   When Dana refused to give Defendants what they wanted, Defendants took Dana's and Bailey's Harbor Beach License No. 1150 without any process or hearing, which stripped them of their property rights in that license, the value of the capital invested in that license, and of the reasonable expectation of revenues generated from that license for Dana's and Bailey's fishing business.

151.   In short, the DNR through Defendants stripped Dana and Bailey of a significant portion of their livelihood all because Defendants want commercial fishing out of Saginaw Bay. *See* **Exhibit A**, *Bay Port Fish Co.,* unpub op at 1-3; (**Exhibit B**, DNR Data on Walleye 1985-2019, pp 1-95; **Exhibit L**, 12/4/09 Email.).

152.   Accordingly, Dana and Bailey suffered damages in the aggregate of not less than $22,808,886.00 based on the reasonable value of the license, and the money invested in its utilization.

WHEREFORE, in the event this Court determines Defendants wield absolute power to strip Dana and Bailey of their commercial fishing licenses, this Court should order just

IBUTZEL\000161882\0001\100261302.v3-4/21/23

compensation for Harbor Beach License No. 1150 in the amount of not less than $22,808,886.00, and any other relief it deems just and equitable under these unique circumstances. It should further order Defendants to pay Plaintiffs' reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b).

**COUNT IV**
**42 U.S.C. § 1983**
**UNCONSTITUTIONAL RETALIATION**

153.    Plaintiff incorporates each preceding paragraph of this complaint as if fully restated.

154.    In relevant part, the First Amendment to the U.S. Constitution as applied to the states by its Fourteenth Amendment prohibits the state and its agents from "abridging . . . freedom of speech . . . ." US Const, Am I.

155.    Individual state actors are subject to suit for damages when they take retaliatory action to chill a person's protected speech under 42 U.S.C. § 1983.

156.    To prevail on such a claim under 42 U.S.C. § 1983, the plaintiff must satisfy the following elements:

'(1) [he] engaged in protected conduct; (2) an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by [his] protected conduct.' [*Sensabaugh v Halliburton*, 937 FF.3d 621, 627-628 (6th Cir. 2019) (internal citations omitted).]

157.    In this case, Dana exercised his First Amendment right to free of speech when Dana told Defendants he would not permanently relinquish his vested property rights in Saginaw Bay License No.s 807, 814, 1119, and 1122, as Defendants demanded.

30

158.    As a direct result, Defendants refused to renew Dana's and Bailey's Harbor Beach License No. 1150.

159.    This arbitrary act by Defendants is intended to force Dana into a corner so that Dana would agree to relinquish his property interests in the four Saginaw Bay License No.s 807, 814, 1119, and 1122.

160.    This kind of star-chamber approach to the exercise of executive power would deter the average person from continuing in refusal of the Defendants' demands.

161.    There is no question that the only reason Defendants stripped Dana and Bailey of Harbor Beach License No. 1150 is because Dana refused to relinquish Dana's property interests in Saginaw Bay License No.s 807, 814, 1119, and 1122.

162.    Illustratively, Defendants would renew Harbor Beach License No. 1150 _today_ if Dana decided to cave to Defendants' demands to permanently relinquish Dana's property rights to those licenses.

WHEREFORE, this Court should find that Defendants James Dexter, Seth Herbst, and Thomas Goniea violated Plaintiffs Dana Serafin's First Amendment right to free speech by retaliating against Dana specifically for refusing to capitulate. This Court should then enjoin Defendants by ordering that Harbor Beach License No. 1150 be immediately reissued to Plaintiffs, and rule that Dana is entitled to collect damages to be set by a jury at trial for Defendants' unconstitutional act of retaliation. And, pursuant to 42 U.S.C. § 1988(b), this Court should order Defendants to pay Plaintiffs' reasonable attorneys' fees and costs associated with this action.

## COUNTS IV & V
## 42 U.S.C. § 1983
## DEPRIVATION OF PROCEDURAL DUE PROCESS

163.   Plaintiff incorporates each preceding paragraph as if fully restated.

164.   These counts are pled against Defendants Dexter, Herbst, and Goniea in their individual (damages) and official (injunctive relief) capacities pursuant to 42 U.S.C. § 1983 as all three are "persons" who deprived Dana and Bailey of their constitutional rights while acting under the color of law.

165.   Based on similar notions of Fourteenth Amendment due process as described above, to prevail on a substantive due process violation, the plaintiff/s must prove "[1] [an] arbitrary and capricious government action [2] [that] deprive[d] an individual of a constitutionally protected property interest." *Warren v City of Athens, Ohio*, 411 F.3d 697, 707 (2005) (internal citations omitted).

166.   Here, based on the attached documentary evidence, Defendants arbitrarily and capriciously stripped Dana and Bailey of their Harbor Beach License No. 1150.  We know this governmental action is in fact arbitrary and capricious because, among other reasons, Defendants would issue Dana and Bailey that license *today* if Dana agreed to relinquish his interest in Saginaw Bay License No.s 807, 814, 1119, and 1122, as Defendants demanded. (*See* **Exhibit Z**, 1/30/23 Letter, pp 1-2; **Exhibit BB**, 3/2/23 Letter, pp 1-3.)

167.   Defendants' arbitrary and capricious actions deprived Dana and Bailey of their constitutionally protected property interest in Harbor Beach License No. 1150.

32

*Pinebrook*, slip op at 10 (reaffirming a Michigan commercial license is entitled to constitutionally protected due process).

WHEREFORE, this Court should find that Defendants James Dexter, Seth Herbst, and Thomas Goniea violated Plaintiffs Dana Serafin's and Bailey Serafin's well-established constitutional right to substantive due process under the Fourteenth Amendment to the U.S. Constitution.  This Court should then enjoin Defendants by ordering that Harbor Beach License No. 1150 be immediately reissued to Plaintiffs.  In the alternative, this Court should order Defendants to immediately reissue Harbor Beach License No. 1150 to Plaintiff Bailey Serafin.  And, pursuant to 42 U.S.C. § 1988(b), this Court should order Defendants to pay Plaintiffs' reasonable attorneys' fees and costs associated with adjudicating this complaint.

## COUNT VI
## DECLARATORY RELIEF

168.    Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated.

169.    Under the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

170.    "In declaratory judgment actions, it is often difficult to draw a line between actual controversies and attempts to obtain advisory opinions on the basis of hypothetical controversies." *Kardules v. City of Columbus*, 95 F.3d 1335, 1343 (6th Cir. 1996).  "[T]he

33

question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

171.    In this case, the future of Dana's and Bailey's commercial fishing operations lie at the mercy of Defendants, who could only conceivably be relying on M.C.L. § 324.46701 in denying the Harbor Beach License, there is a substantial controversy of sufficient immediacy between parties with adverse legal interests, making this "a case of actual controversy."

172.    The matter is also within the jurisdiction of this Court. 28 U.S.C. § 1331. Therefore, this Court is authorized to "declare the rights and other legal relations" of the parties with respect to the constitutionality of M.C.L. § 324.46701, under 28 U.S.C. § 2201(a).

173.    As stated above, Defendants and their attorneys at the Michigan Department of Attorney General are presumably relying on the unconstitutionally broad authority supposedly granted to it under M.C.L. § 324.46701:

> Notwithstanding any other act or part to the contrary, any statute or law of this state governing commercial fishing may be suspended, abridged, extended, or modified by the department when, in the opinion of the department, that action is necessary for the better protection, preservation, maintenance, and harvesting of the fish. The existing statutes and laws regulating commercial fishing shall remain in full force and effect unless suspended, abridged, extended, or modified by order of the department in the manner provided in this part or by subsequent acts of the legislature.

IBUTZEL\000161882\0001\100261302.v3-4/21/23

174.    M.C.L. § 324.46701 is facially unconstitutional because it plainly authorizes a state agency and its officers, like Defendants, to violate a licensee's due process rights guaranteed by the Fourteenth Amendment to the U.S. Constitution by subjecting any licensee "to 'arbitrary or capricious' action by [Michigan] . . . [via] administrative action." *Johnson v. City of Saginaw, Michigan*, 980 F.3d 497, 513 (6th Cir. 2020).

175.    Regardless of what procedures the DNR and its officers might employ in acting under M.C.L. § 324.46701, the statute plainly authorizes a state agency to rewrite *any* state law—and to ignore constitutional protections established by federal caselaw—if the DNR determines "that action is necessary for the better protection, preservation, maintenance, and harvesting of the fish." *See Id.*

176.    This blast-from-the-distant-past concept, in and of itself, shocks the conscience of today by undermining basic principles of separation of powers and the constitutional protections afforded by the Fourteenth Amendment.  Frankly, there is no conceivable situation in which a licensee can receive due process under M.C.L. § 324.46701 when the DNR and its officers, not the Michigan Legislature, are the sole arbiters of whether to—on a whim—suspend, abridge, or modify "any law" that would otherwise apply.

177.    Plaintiffs in this case, nor anyone else who may find themselves at the mercy of Defendants in the future, should not be subject to such unconstitutional gamesmanship by Defendants again.  This should end once and for all.

WHEREFORE, this Court should grant Plaintiffs declaratory relief as follows: (1) declare M.C.L. § 324.46701 is patently violative of the U.S. Constitution's Fourteenth

Amendment due process clause as it provides Defendants the opportunity to serially violate all known statutory and administrative process, and constitutionally binding jurisprudence, at will; (2) declare Defendants so violated Plaintiffs' substantive and procedural due process rights in this case by applying M.C.L. § 324.46701 since there's no conceivable or identifiable justification elsewhere in federal or state law; (3) declare that Defendants may never again engage in such constitutionally violative conduct under the purported authority of  M.C.L. § 324.46701; and (4) grant any additional relief this Court finds just and equitable under these circumstances.

Respectfully submitted,

**BUTZEL LONG, P.C.**

By:
Garett Koger (P82115)
2410 Woodlake Drive, Suite 420
Okemos, MI 48864
(248) 258-2907
koger@butzel.com
*Attorneys for Plaintiffs*

Dated: April 21, 2023

36

## VERIFICATION

Dana Serafin, being first duly sworn, deposes and states that he has read this Verified Complaint and that the matters and claims addressed herein are true to the best of his knowledge, information, and belief, except as to the matters and/or claims which are stated to be upon information and belief, and as to those matters, he believes them to be true.

_____

Dana Serafin
Principal, Lixey Fish Company

37

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**DANA SERAFIN, BAILEY SERAFIN**, and
**LIXEY FISH COMPANY**,                                    Case No.

      Plaintiffs,                                            Hon.

-v-                                                        Mag.

**THOMAS GONIEA**, in his individual and          **JURY DEMAND**
official capacity, **JAMES DEXTER**, in his
individual and official capacity, **SETH**
**HERBST** in his individual and official
capacity, and **THE MICHIGAN**
**DEPARTMENT OF NATURAL**
**RESOURCES**,

      Defendants.

_____

**BUTZEL LONG, P.C.**
Garett L. Koger (P82115)
Aaron Davis (P77406)
Louis F. Ronayne III (P81877)
2410 Woodlake Drive, Suite 420
Okemos, MI 48864
(248) 258-2907
koger@butzel.com
fishwick@butzel.com
ronayne@butzel.com
*Attorneys for Plaintiffs*

_____

Plaintiffs demand a jury trial with respect to all issues triable of right by a jury.

**BUTZEL LONG, P.C.**

By: /s/ Garett Koger
Garett Koger (P82115)
2410 Woodlake Drive, Suite 420
Okemos, MI 48864

Dated: April 21, 2023

(248) 258-2907
koger@butzel.com
*Attorneys for Plaintiffs*

IBUTZEL\000161882\0001\100261302.v3-4/21/23